REGAN, Judge.
Plaintiffs, Emmett J. Charbonnet and his subrogee insurer, United States Fire Insurance Company, instituted this suit against the defendant, Orkin Exterminating Company, endeavoring to recover the sum of $1,657.50 [1], representing the cost of repairing termite damage to the Charbon-net home.
The plaintiffs asserted that it resulted from defendant’s negligent undertaking of a contract to control and obliterate termite infestation and that liability stemmed from negligent performance and the breach of a contractual warranty to free the premises of termites and the resulting damages emanating therefrom after performance.
Defendant answered and denied the existence of any liability, it then explained that the damage complained of pre-dated its treatment of the premises.
From a judgment in favor of plaintiffs, the defendant has prosecuted this appeal.
The record reveals that the plaintiff purchased a large, two-story home of stucco construction at No. 16 Fontainbleau Drive in the City of New Orleans in 1956. At that time he found termite damage in several sills and supporting joists in the basement. The damage was repaired and he then contacted the defendant to obtain chemical treatment to halt further termite infestation. Charbonnet testified that he initially discussed the job with a Mr. Dah-renburg of Orkin and was told the contract could be performed in two days at a cost of $240.00. The agreement was reduced to writing on a standard form used by defendant and it provided in part:
“The termite contractor agrees to treat the building * * * and to eradicate all subterranean termites therein during a period of two years from date hereof under the following terms and conditions.

“Failure of the Termite Contractor to eradicate any infestation, within six months after commencement of work hereunder, or failure to eradicate any re-infestation of Termites on premises hereunder, within six months after discovery and written notice thereof to Termite Contractor, shall be deemed failure of Termite Contractor to fully perform its Obligation hereunder.
“ * *- * nor shall the Termite Contractor be responsible for damage done to the building and its contents by termites except damage caused by gross negligence of the Termite Contractor.
*150 “The Termite Contractor agrees to use first class materials and workmanship, and agrees to inspect the premises annually without charge during the next 2 years.
* * * * * *
“This contract may continue in force on a service basis after the expiration of the contract at the option of both parties.”
a handwritten addendum described in detail what services would be performed, including extensive digging of trenches and chemically treated outside soil, and drilling and treating the slab, sills, brick and tile at numerous locations.
Several days after the contract was signed, Charbonnet testified two men appeared at his home with one 55 gallon drum of chemical and completed the job within five hours. The work was performed in December 1956 and on January 4, 1957, plaintiff wrote a letter to the defendant in which he asserted the job was hurriedly and improperly performed. He further stated that he had been overcharged for the work because Mr. Dahren-burg told him the termite treatment would take two days and it was actually completed within five hours. In response to this complaint Orkin agreed to compensate the plaintiff by extending its annual inspection provision in the contract to four years free of charge rather than the two specified in the contract. Although the contract was renewed annually until 1968, Charbonnet testified Orkin never successfully treated his home against termite infestation, and that despite his innumerable complaints and Orkin’s efforts to treat the premises, the termite problem persisted.
Charbonnet’s testimony that the termite problem manifested itself within six months of the initial treatment and was never satisfactorily checked by repeated treatments is corroborated by the correspondence between him and Orkin and the testimony of one Bob Bailey, a former Or-kin manager. Plaintiff wrote a letter to Orkin in June, 1957, wherein he recited two occurrences of swarming termites within the six month period after the initial treatment was performed. Letters written between this time and 1963 show frequent complaints of termites reappearing inside the Charbonnet home. In 1963 Orkin paid the plaintiff $72.00 in settlement of a claim resulting from termite damage.
In January 1968, a portion of the outside stucco wall of the Charbonnet house fell away exposing termite damage to the interior of the porch wall and the 2x4 studs. It is the cost of repairing this damage that forms the subject matter of this litigation.
Herman J. Abry, a repairman, testified that he repaired this damage, which he attributed to termites, at a cost of $1,457.50. The balance of the claim represents the cost to paint the house after the repairs were made.
James A. Arceneaux, a pest control investigator for the Louisiana Department of Agriculture, Pest Control Commission, examined the damage that became apparent in 1968 at the defendant’s request. He was the only expert exterminator to do so, and he was called as a witness for the plaintiff; however, his testimony failed to resolve the issue as to whether the termite damage had occurred prior to 1956 or after defendant undertook the termite treatment designed to obliterate live termites. He stated that he found no live termites at the site, in fact, the powdery appearance of the wood indicated the damage was at least five years old. He further asserted there was no way to pinpoint the time when live termites actually caused the damage to the premises. In exterminator’s terminology, old damage to a structure is any in which live termites cannot be found. Arceneaux also explained that swarming termites, as described by Charbonnet, are not the destructive termites. They simply are termites in a stage of the reproductive cycle that do not at this early stage infest and destroy wood. He did point out that the presence of swarming termites indicated *151 that live adults are nearby. When questioned as to whether the appearance of swarming termites inside the basement would indicate live termites within the house itself, he answered affirmatively.
Based on the foregoing evidence, the trial court concluded that the defendant inadequately performed its initial treatment of the plaintiff’s home and that the 1968 damage occurred as a result of termite infestation that occurred while defendant’s contract was in effect. In written reasons for judgment, the lower court dealt squarely with the difficulty in adducing competent evidence to support or defeat a claim of this nature. He stated in part:
“Though scant, the plaintiff’s evidence supports the inference that the initial treatment by Orkin was not adequate. When Mr. Bailey and Mr. Arceneaux were asked if two men could do the work in five hours, they said it ‘could be done’ or it was ‘possible’ but their emphasis connoted it was not likely.”
As to the initial treatment, Charbonnet testified that only one barrel of chemical was brought to the site and both exterminators, Bailey of Orkin and Arceneaux, testified this was not enough to do the job. Since Charbonnet was not present when the entire service was performed, we are not convinced that his testimony establishes as a fact that only one barrel of chemical was used. However, we are convinced from the record that the termite treatment performed was not of the quality plaintiff had been led to believe he would receive. His testimony and his letter to Orkin establish that one of defendant’s representatives stated this was a two day job. Completion within five hours time raises a strong inference that the contract was performed improperly, hurriedly and negligently. In the course of oral argument before this court, defense counsel insisted that the record fails to support the trial judge’s statement in the quoted portion of his reasons that the experts left the impression that completion of an undertaking of this size within five hours was not likely.
In rejecting this argument, we must point out that voice inflections and mannerisms of witnesses are not reflected by the printed transcript. We cannot therefore ignore the trial judge’s evaluation of the response: “It is possible” without having the benefit of viewing the witness. Here, the oft-cited rule of appellate review is applicable, i. e., the lower court’s evaluation of witnesses should be given great weight and remain undisturbed in the absence of manifest error.[2]
Having concluded that the initial termite treatment was defective, we are relegated to a determination of whether the damage found in 1968 pre-dated the 1956 contract or whether it was caused by live termite infestation after defendant assumed responsibility for termite control. We readily agree with the lower court’s comment, to the effect that the evidence adduced herein is “scant.” However, predicated upon plaintiff’s testimony that he observed live termites swarming inside the house, and the expert’s conjecture this probably indicated live termites on the inside, we conclude Orkin failed to perform the job it contracted to do, i. e., eradicate live termites. And considering the manner in which the termite proofing treatment was initially performed, we have no difficulty concluding that the termite damage was caused by gross negligence, for which defendant, under its contract, is liable.
For the reasons assigned, the judgment appealed from is affirmed.
Affirmed.

. Charbonnet was paid $1,582.50 under a home owners’ policy and to this extent he subrogated his claim to his insurer. He claims the balance of $75.00 individually-

. Readco Industries, Inc. v. Myrmox Specialties, Inc., La.App., 236 So.2d 573 (1970).