292 So.2d 851 (1974)
Tommy EDWARDS, Plaintiff-Appellee,
v.
TERMINIX 57, INC., et al., Defendants-Appellants.
No. 12269.
Court of Appeal of Louisiana, Second Circuit.
March 19, 1974.
Rehearing Denied April 23, 1974.
Writ Refused June 7, 1974.
Kostelka & Blackwell, by Marshall Blackwell, Monroe, for defendants-appellants.
*852 Brown & Wicker, by Robert A. Lee, Monroe, for plaintiff-appellee.
Before AYRES, BOLIN and WILLIAMS, JJ.
BOLIN, Judge.
Tommy Edwards sued Terminix 57, Inc., and its alleged insurer, Sun Insurance Office, Limited, for damages to his residence as the result of an alleged breach by Terminix of a termite service contract. The contract was originally entered into between Terminix and L. M. Ballard, plaintiff's vendor, and plaintiff alleges he was substituted as a party to the agreement upon his purchase from Ballard of the house made subject of the contract. Defendant filed peremptory exceptions of no right of action and non-joinder of an indispensable party, which were apparently overruled. Defendant answered contending plaintiff had no standing to sue since the damages occurred prior to any contractual relationship between the parties; that the contract specifically provided Terminix would not be liable for damages; and that the defendant in fact complied with all obligations imposed by the contract.
Following trial the court found Terminix had breached the contract and rendered judgment in favor of plaintiff against Terminix for $5,000. Terminix appealed, reurging its exceptions, alleging that any damages to the house which might have been occasioned by termites occurred during the contract with Ballard and that Ballard was an indispensable party to the action; that since Edwards was not in privity to the contract he has no right or cause of action. Plaintiff has neither appealed nor answered the appeal, therefore the claim against Sun Insurance is not before the court. We affirm the judgment of the district court.
The record reflects L. M. Ballard entered into a contract with Terminix 57, Inc., in 1955, the year Ballard built his home. The contract provided:
"Effective beginning March 31, 1955, the undersigned Terminix Company hereby agrees to provide protection service against the attack of subterranean termites for the property described below for the sum of $141.00 One hundred forty-one and no/100 dollars.
"The Terminix Company further agrees that future applications of Terminix and all related operations to provide continuous protection service against the attack of subterranean termites, found necessary upon reinspection, shall be performed at no additional cost. This contract does not guarantee against present or future termite damage to property or contents, nor provide for repairs or compensations therefor.
"All agreements herein shall be in full force to: March 31, 1957. The Terminix Company agrees to extend their contract annually for the sum of $16.00 per annum. . . ." (Emphasis added)
The contract was kept in force by Ballard until he sold the house in 1970 to plaintiff. Thereafter plaintiff was substituted as a party to the contract which was renewed annually until March, 1972, when plaintiff cancelled the service.
The record reveals that during the years prior to 1970 termite activity had been discovered and Terminix had treated the house at least six or seven times. When plaintiff purchased the house in 1970, termites were again found and it was necessary for Terminix to re-treat it. The last time the house was treated by defendant for termites was in April, 1971.
Plaintiff cancelled the contract in 1972 because Terminix failed to find termite activity when called upon to inspect the premises, and inspection by another company immediately thereafter revealed that termites were actually present and had caused damage to the house. This was verified by the State inspector.
There is no dispute there was a contract between Terminix and Edwards. The *853 manager and part owner of Terminix testified it was the company's normal procedure to substitute the new owner of a home as a party to a service contract. Also, Edwards had sent defendant a yearly renewal payment which was accepted, and Terminix had sent its service people to the Edwards home during this contractual period. Terminix simply alleged it performed the contract according to its terms.
Appellant's first contention is there was no breach of the contract between Terminix and Edwards, relying on the following provision:
"This contract does not guarantee against present or future termite damage to property or contents, nor provide for repairs or compensations therefor."
It is axiomatic that a contract must be read as a whole and all ambiguities shall be construed against the person preparing the contract. Louisiana Civil Code, Articles 1955, 1957; Pothier v. Barber Laboratories, 227 La. 357, 79 So.2d 481 (1955).
We agree with the trial judge that the contractual clause quoted above is quite different from the clauses construed in the cases reviewed by the court, and that this clause, when read with the remaining provisions of the agreement, does not absolve defendant Terminix from liability for breach of the contract.
The trial court stated:
"The court is of the opinion that if Terminix Co. had performed the service it agreed to, then that clause would be effective and it would not be liable for repairs of termite damage, but that clause does not absolve it from liability for breach of contractfor failing to do what it had contracted to do, namely, inspecting and treating the premises for termites.
"It seems obvious that if the damage discovered in 1972 was as extensive as the evidence showed, it should have been easily ascertainable by defendant upon the inspection by its employee."
Terminix's second contention is that any termite damage occurred prior to the contract with Edwards. There is actually no proof of when the damages occurred. They may have occurred before or after Edwards bought the house. However, in either case plaintiff is the proper party to recover all damages resulting from Terminix's breach of the contract.
Contrary to appellant's contention, Terminix did not have a personal obligation to Ballard and a separate personal obligation to Edwards. Bogart v. Caldwell (La.App.2d Cir. 1953) 66 So.2d 629 (at 632), the court defined and discussed the personal obligation:
"`The general rule is that all the obligations of the ancestor pass to his heirs, active as well as passive. The exceptions to this rule are those obligations, which result from agreements in which the personal qualities of the person promising are to be supposed the leading motive of the contract, and where the want of them cannot be supplied by any other, or compensated by pecuniary damages. Such is the confidence we repose in our physician, who assists us in sickness; the painter whom we may desire to make family portraits; and in case of their decease, their heirs cannot demand that they shall be permitted to supply their place or perform their contract. But an engagement to ship cotton may be performed by any one, the qualities of mind are not the leading consideration that induced the contract. Pecuniary responsibility is the moving cause, because the nonperformance can be compensated in damages and no objection can be made to the heirs, on that score, where they are the creditors of the person whose engagement they seek to enforce.'"
It then described the heritable obligation:

*854 "The heritable obligation is one from which there arises the right of the heirs and assigns of one party to enforce the performance against the heirs of the others. Heritable obligations and stipulations give to and impose upon heirs, assigns and other representatives the same duties and rights that the original parties had and were liable to, except that beneficiary heirs can only be liable to the amount of the succession. Every obligation shall be deemed to be heritable as to both parties, unless the contrary be specifically expressed or necessarily implied from the nature of the contract. Articles 1997, 2008, LSA:Civil Code."
Also appropriate to resolution of the instant case is Louisiana Civil Code Article 2009:
"All rights, acquired by a heritable obligation, may be assigned; this assignment may be made, expressly by contract granting such right, or impliedly by the conveyance of the property to which they are attached." (Emphasis added)
We find the intention of both parties in this case was to assign all rights and obligations of the contract from Ballard to Edwards with the conveyance of the residence. In fact, this is what was done, as evidenced by the substitution of Edwards as obligor, by the payments by Edwards, and by the fact that service was performed by Terminix on the premises after the assignment.
In Breaux v. Laird, 223 La. 446, 65 So. 2d 907 (1953) the court applied for the first time Article 2011 of the Civil Code to reverse a holding that there was no privity of contract between a purchaser of a house and the surety for the construction contractor. Article 2011 provides:

"Not only the obligation, but the right resulting from a contract relative to immovable property, passes with the property. Thus the right of servitude in favor of immovable property, passes with it, and thus also the heir or other acquirer will have the right to enforce a contract made for the improvement of the property by the person from whom he acquired it." (Emphasis added)
In Breaux it was held the obligation which flowed from the surety contract passed to the successors and vendee-assignee of the owner.
We find Civil Code Articles 2009 and 2011 apply to the present situation and the obligation to perform the termite protection service was continuous and was assigned to plaintiff when he bought the house and continued the payments under the contract. Therefore, regardless of when the damages occurred, plaintiff is entitled to recover from Terminix 57 those damages resulting from its breach of the contract.
Ralph Gill, a contractor, who was the only witness testifying as to the damage caused by termites, estimated the cost of repairing the walls at $12,661.06. He testified there was no way of estimating exactly how much damage was caused, but in his 15 years experience in making repairs of this nature the damage usually was more than he figured. He stated it would be necessary to remove, then repair, then rebuild the existing walls; that when the extent of the damage was determined the cost would be reduced by the number of wall studs and the amount of wiring that was not damaged. However, the cost of removing the eight or more walls and subsequently rebuilding them was a determinable cost which would not vary greatly from the estimate.
The trial judge awarded judgment of $5,000 which we think is fair in view of the testimony.
The judgment of the trial court is affirmed at appellant's cost.