LEMMO'N, Judge.
This suit by Joseph Melancon and Alan Ruiz, the former and present owners of a residential building, seeks recovery against A & M Pest Control Service, Inc. for the cost of repairing termite damage to the structure.
The trial court awarded damages to Ruiz, and A & M appealed. The principal issues on appeal are (1) whether the termite infestation occurred because of A & M’s failure to properly perform its obligations under its contract with Melancon; (2) whether A & M had an obligation under that contract to Ruiz for repair of the damage; and (3) whether the amount awarded was excessive.
A & M had contracted with Melancon in February, 1970 to furnish subterranean termite control for a period of two years.[1] The initial treatment under the contract included trenching and treating of the outer perimeter of the building’s slab and treating the bath trap and shower head.[2] The serviceman who performed the initial treatment made no notation as to active infestation or damage.
In December, 1970 Melancon sold the house to Ruiz. In connection with the sale Melancon turned over his contract with A & M to Ruiz and instructed him to pay the renewal fee when it became due in February, 1972.
A & M’s records indicated an attempt to contact Melancon for the annual inspection in February, 1971, with no response. However, in November, 1971 Ruiz complained to A & M about flying insects in the kitchen and numerous pieces of wings in the attic, and A & M sent a serviceman to inspect the premises, apparently as a service under the original contract. The serviceman identified the insects as flying ants (not members of the termite family) and assured Ruiz he had no cause to worry about termites. He reported that he “(c)hecked bath areas, also treated bath trap” and found “no visible evidence of active termites”.
On January 12, 1972 the serviceman reinspected the premises after another complaint by Ruiz of flying insects. He again identified the insects as flying ants and again reported no visible evidence of active termite infestation.
In February, 1972 A & M called Ruiz to set up the annual inspection, which was ultimately performed on March 1 along with retreatment. Ruiz paid and A & M accepted the renewal fee specified in the contract, Ruiz testifying that A & M’s representative told him he could keep the contract in effect by paying this fee. However, no new warranty was ever issued in Ruiz’s .name.
In late April, 1972 Ruiz’s brother, a painter, undertook to paint the bathrooms. In preparing the wall surface, he discovered that dark spots thought to be mildew were not solid and upon investigating further discovered active termites in the bathroom wall. He and Ruiz then checked the attic and found tunnels, wings and other evidence of termite infestation along the ceiling joists.
Ruiz contacted A & M, as well as the Louisiana Structural Pest Control Commission. On May 2, 1972 A & M’s inspector found termites (swarmers) in the bath trap and also found infestation in the sheetrock *393 above the shower stall in the bathroom. The following day the Commission’s inspector found infestation in the attic on the joists above the bathrooms. He advised Ruiz to “provide access opening to shower and toilet pipes in bathrooms which aren’t as yet visible, and properly treat”.
A & M returned the following week and treated the bath trap, the area behind the shower head, the area under the face bowl and the bathroom walls (by drilling holes in the sheetrock). The Commission’s inspection two days later revealed that no active termites remained.
Ruiz demanded that A & M repair the structural damage, but A & M denied any responsibility under the contract. Ruiz (together with Melancon) then instituted this action.
A & M argues on appeal that Ruiz’s proof was insufficient to support the judgment, since there was no evidence as to termite trails (tunnels constructed by termites through which they travel in required darkness back and forth from inside the building to the earth, their moisture source) and no other evidence of active termites around the perimeter of the slab or in the bath trap area. Pointing out that the contract requires the owner to “immediately eliminate faulty plumbing, leaks and dampness from drains, condensation or leaks from the roof or otherwise into, onto or under said area treated”, A & M contends that the most logical explanation of the infestation was that termites entered (before the initial treatment or after) through doors, windows, screened overhangs, or other sources and then were maintained (without having to return to the soil) by independent moisture sources which Ruiz allowed to exist in the building.
In support of this argument A & M emphasizes its manager’s testimony that he inspected the bathrooms when first notified of the problem (apparently in late April) and saw signs of moisture or a water leak in the bathroom area on the ceiling. However, the manager gave no further description of the moisture evidence, and he did not perform any inspection. The serviceman who performed two complete inspections in May did not testify as to any moisture or leak. The only other testimony as to any leak or moisture anywhere in the house was the statement by Ruiz’s brother that about a year after the infestation he repaired the flat roof over the garage (the house had a hip roof), which was on the same side of the house as the bathrooms, after Ruiz had discovered some leaking around the soffit. However, no one found any indication of termites near the garage area at any time, and the only reported locations of active termites or of damage was in the bathroom walls and ceilings and in the attic under the hip roof above the bathrooms and above the adjoining kitchen and hall.
We believe that the more plausible explanation of the infestation arises from the evidence of swarming termites in the bath trap, which A & M had inspected and treated only two months earlier and had checked two additional times in the previous four months.[3] Since this dark area afforded some moisture and was also a route through the slab to moisture in the earth, and since active termites were found only in the rooms containing the trap and in the attic just above, we conclude (as apparently did the trial judge) that the infestation occurred more probably than not because of A & M’s failure to properly inspect and treat the bath trap area. We find this explanation more plausible than *394 the only other reasonable explanation offered — that the termites were sustained by an independent moisture source in the building — especially in view of the lack of acceptable evidence that a moisture source was found. Proof by direct or circumstantial evidence is sufficient to constitute a preponderance when the proof, taken as a whole, shows that the fact or causation sought to be proved is more probable than not. Jordan v. Travelers Ins, Co., La., 245 So.2d 151 (1971).
A & M further argues that it only contracted to treat the perimeter and that it was not obliged under the contract to repair- the damage. A & M particularly denies any obligation to Ruiz, in whose favor the judgment was rendered, contending the written warranty was personal to Melan-con.
A & M’s contract with Melancon provided in pertinent part:
“Due to extreme hazards encountered in slab type construction and the possibilities of hidden infestations, the Termite Contractor cannot be held responsible for any damage to the structure or its contents caused by termite activity.*
“ * Supplemented by warranty against future termite damage up to $25,000.”
The pertinent provisions of the written warranty were:
“* * * A & M PEST CONTROL SERVICE, INC., has issued this lifetime subterranean termite warranty and will provide such repairs to the said premises attributable to new damage caused by subterranean termites, PROVIDED, it is established that said new damage was caused by subterranean termites after the date of initial treatment and live subterranean termites are present in the damaged areas at the time the same is brought to the attention of the undersigned; it is further understood that in no event shall this warranty obligate the undersigned to provide such repairs in excess of the sum of $25,000.00, subject to the provisions above recited.
“This warranty is an integral part of the Contract between the customer named above and A & M PEST CONTROL SERVICE, INC., and shall exist only so long as the Contract itself continues. The obligation of A & M PEST CONTROL SERVICE, INC., in this warranty is controlled by all of the terms and conditions of the Contract itself, including the provisions by which the Contract may be terminated. This warranty shall also terminate with the life of the customer named above to whom this warranty is issued. This warranty agreement is personal to the customer named above and may not be assigned or transferred by any means whatever by the person to whom it is issued.” (Emphasis supplied)
Although the contract and warranty were issued to Melancon, Ruiz testified that A & M’s representative with apparent authority to do so told him the contract could be kept in effect by paying the renewal fee. A & M not only did not deny this statement, but also accepted the renewal fee from Ruiz and contacted him to arrange the annual inspection and treatment pursuant to the contract. We therefore conclude that A & M ratified its agent’s agreement to allow Ruiz to take over its contract with Melancon by providing service and accepting payment under the contract, and Ruiz therefore had a right of action to enforce the terms of the contract. See Edwards v. Terminix 57, Inc., 292 So. 2d 851 (La.App. 2nd Cir. 1974).
Furthermore, A & M’s obligation under the contract was to provide repairs attributable to new damage caused by subterranean termites. Inasmuch as we have concluded that Ruiz proved subterranean *395 termites caused damage to the building after the initial treatment and that this damage occurred because of A & M’s failure to properly perform its obligations under the contract, we hold that A & M is liable to Ruiz for the repair of the damage.
As to the amount of the award, Ruiz presented the testimony of two building contractors who estimated the cost of labor and materials required to repair the termite damage. One proposal included removing the sheetrock and wall tile, then replacing the studs, plates and ceiling joists in the two bathrooms and the adjacent areas of the blaster bedroom, kitchen and hall, and finally refinishing the wall and ceilings, including retiling and repainting, for a cost of $5,678.00. The other contractor estimated from the visible areas of decay and evidence of major structural damage that repairs would cost between $6,225.00 and $8,450.00, but recommended tearing into the walls and ceilings before an exact proposal could be made. Ruiz declined to do this because he could not then afford to complete the repairs, which had still not been accomplished at time of trial.
A & M complains that the $7,000.00 award was excessive because the extent of termite damage, if any, in the stud walls was unknown until the sheetrock was removed. The estimates, however, were to repair the observable damage and to remove and later replace the wall coverings to determine hidden damage. The latter steps were necessary to insure the integrity of the walls in the area of observable damage, whether or not detailed inspection revealed extensive damage in the stud walls. The first contractor conceded his proposal was too low if stud wall damage was extensive, and the second contractor submitted a range in price because of this unknown quantity.
The $7,000.00 award apparently represented a consensus figure taken from some of the testimony of both experts. Since under the circumstances of this case an award of damages cannot be calculated with mathematical certainty, we find no error in the amount awarded on the basis of the evidence in this record.
The judgment is affirmed.

Affirmed.

. R.S. 40:1269 provides the requirements for a licensed pest control operator’s contract to control or eradicate termites.

. The purpose of trenching and treating along the slab is to form a chemical barrier which prevents termites from entering the building by that route. Since termites require moisture almost daily, the barrier also traps any termites inside the building, causing them to die from lack of moisture. The bath trap, which is actually a hole in the slab going through to the earth below, is also treated in the initial treatment.

. A & M’s serviceman testified as to the difference between nondestructive swarmers and wood-eating workers, but admitted that workers usually are in the building when swarmers are found. Therefore, we attach no great significance to the fact that only swarmers were found in the bath trap. See also Maguire v. Masino, 325 So.2d 844 (La.App.4th Cir. 1975); Charbonnet v. Orkin Exterminating Co., 254 So.2d 148 (La.App.4th Cir. 1971).