337 So.2d 584 (1976)
TEXHOMA CONTRACTORS, INC.
v.
SOUTHERN SHIPBUILDING CORPORATION.
No. 7512.
Court of Appeal of Louisiana, Fourth Circuit.
August 31, 1976.
*585 Wayne C. Guidry, Grand Isle, Alma L. Chasez, New Orleans, for plaintiff-appellant.
Michael J. Paduda, Jr., Bogalusa, for defendant-appellee.
Before SAMUEL, GULOTTA and MORIAL, JJ.
SAMUEL, Judge.
Plaintiff, Texhoma Contractors, Inc., filed this suit against Southern Shipbuilding Corporation seeking $30,000 in damages for the alleged wrongful conversion of tackle and appurtenances from a drilling barge sold by defendant to plaintiff. Plaintiff also obtained a writ of sequestration by which it took the tackle and equipment into its possession.
Defendant answered, denying any conversion of property and asserting it had sold plaintiff only the barge and not the tackle and appurtenances. Approximately three months later defendant filed a motion to dissolve the writ of sequestration and sought damages in the amount of $33,000. The writ was dissolved on defendant's contradictory motion, and the question of damages (including attorney's fees) was referred to the merits for trial.
Following a trial on the merits, judgment was rendered in favor of defendant, dismissing plaintiff's suit and awarding defendant $15,000 in damages. Plaintiff has appealed from that judgment.
The drilling barge, the Chris Zeppa, was owned by the defendant, and held out by it for sale. When representatives of the plaintiff first saw the barge, it was floating. Subsequently, but prior to the sale, it sank in Sawmill Pass in the Rigolets area east of Lake Pontchartrain.
The plaintiff corporation is owned by Harold Schertler. However, prior to the sale in suit his brother, John Schertler, primarily was interested in acquiring the barge for its salvage or scrap value. The evidence indicates the two brothers agreed to split the profits from the venture, with Harold to furnish the money and John to furnish the labor. On April 5, 1974, the Schertler brothers went to the defendant's place of business for the purpose of purchasing the barge. The defendant originally asked $75,000 for the barge, but the Schertler brothers said they were incapable of paying more than $60,000, that price was agreed upon, and the following document was executed:
*586 
Defendant admits receipt of the entire $60,000 purchase price. The first $5,000 was paid as earnest money to induce the defendant to raise the barge from the bottom of Sawmill Pass, and the remaining $55,000 was paid by certified check on April 15, 1974, after the barge had been raised. Plaintiff contends it purchased the entire barge, including the tackle and appurtenances allegedly taken by defendant. Numerous items were sequestered, but the primary items relative to defendant's damage claim are two ten ton cranes and two anchor winches.
Defendant offered testimony which established uniformly an agreement by it to sell only the barge, retaining the right to remove any tackle or appurtenances which might be useful to it. Defendant's employees explained that the original purchase price was $75,000 and it agreed to reduce the price to $60,000 upon condition it could remove from the sunken barge whatever equipment might be useful to it, including the cranes and winches. Defendant's employees further testified some copper cable alleged to be missing had been stolen sometime prior to the sale.
*587 Defendant also offered the testimony of John E. Hart and Lee F. Richardson, both of whom stated they had endeavored to purchase the barge from the defendant at one time or another. Hart testified the purchase price quoted to him was $55,000 for the barge alone with all appurtenances stripped therefrom. Richardson testified he attempted to purchase the barge on the day plaintiff made its purchase, and he was prepared to pay $75,000 for the barge alone, excluding any tackle, equipment or appurtenances.
The testimony of Harold and John Schertler was diametrically opposed to that offered by the defendant. They testified they negotiated for and bought the barge in its condition as it was on April 5, 1974, subject only to the raising of the vessel and the other terms provided in the bill of sale. Both testified it was their intention to salvage or otherwise dispose of and sell the ship's equipment and machinery, and much emphasis was placed on the value of approximately 900 feet of copper cable which John Schertler stated he saw prior to the time the vessel was raised from the water.
John Schertler further testified he discovered the equipment and tackle were missing on either April 15, 1974, when the barge was raised, or the following day. When Harold Schertler was informed by his brother of the missing tackle and equipment, he proceeded to inspect the area by airplane, at which time, visually from the air, he located the objects on the premises of the defendant's shipyard in Slidell, Louisiana.
Plaintiff argues the trial court committed error by permitting introduction of testimony regarding contract negotiations and intentions of the parties prior to the execution of the sale in order to determine exactly what was sold thereby. It cites Baton Rouge Sash & Door Co., Inc. v. Saale,[1] as authority for the rule that when verbal negotiations are incorporated in a written agreement the contract evidences the total understanding of the parties and neither may rely upon prior discussions or understandings to change the terms of the document. It further argues that any ambiguity in the written bill of sale should be interpreted against the defendant, since it was defendant's employee who prepared the sale document.[2]
It is undisputed the document evidencing the sale was prepared by defendant's employee on the same day an agreement was reached and while plaintiff's representative and defendant's employees waited. This is not a situation where great time, effort, and consideration was given to drafting a contract to favor one party or another, and a simple reading of the contract reveals that fact on its face. Under these circumstances, more applicable to the present case is the exception to the general rule which permits parol evidence when the terms of the written agreement are ambiguous and susceptible of more than one interpretation. Where the intent of the parties cannot be ascertained from the language employed, parol evidence is admissible to clarify the ambiguities and to show the intentions of the parties.[3]
In the present case, there was clearly ambiguity regarding the intention of the parties to include in the sale the ship's gear, appurtenances, and tackle. The trial judge properly took evidence on this issue in order to reach a conclusion as to the meaning and the intention of the parties. Taking this evidence did not contradict the terms of the contract but instead merely supplemented and clarified the intention of the parties.
Having taken this evidence, the trial judge was faced with serious issues of conflicting fact. On the one hand, defendant *588 offered testimony showing only the barge and not the tackle and appurtenances were included in the sale. On the other hand, plaintiff offered evidence showing the parties intended to purchase the vessel together with all of its tackle and appurtenances. The only possible exceptions in plaintiff's evidence were the two cranes. In this regard, John Schertler testified defendant's representative discussed the possibility of removing the two cranes but the issue rested there with no final determination ever having been made.
Thus, the trial judge was faced with a question of fact, a resolution of which was dependent upon his evaluation of the conflicting testimony, and his resolution of that conflict cannot be reversed since it is not manifestly erroneous.[4] We consequently affirm the holding that the items sequestered by plaintiff were and remained the property of the defendant and that plaintiff executed a wrongful sequestration of defendant's property.
However, the award of $15,000 for damages is erroneous and must be amended. The finding of damages is based primarily upon defendant's deprivation of use of the two ten ton cranes and two anchor winches by plaintiff's wrongful sequestration. The facts show the cranes and winches were mounted on the then sunken drilling barge on April 5, 1974 when plaintiff purchased the barge. The barge was not raised until April 15, 1974, and then only after plaintiff made an earnest deposit of $5,000. The sequestration suit was filed on May 2, 1974, but defendant's rule to dissolve the sequestration was not filed until August 12, 1974.
These circumstances raise doubt regarding the immediacy of defendant's need for the two cranes. Nevertheless, defendant's employees and especially Charles E. Cunningham, its executive vice president, testified the two cranes were needed by the defendant in order to comply with a contract for the construction of two tugboats. This contract, according to Cunningham, contained a $200 per day demurrage clause, but since the delivery date had not been reached at the time of the trial, he could only estimate the three month demurrage clause by the sequestration of $200 per day, resulting in total damage of $18,000 per vessel or $36,000 total.
The trial judge cited the case of Ralph's Fleet, Inc. v. American Marine Corp.,[5] which involved a claim for damages by a shipyard for wrongful sequestration of a crane. In that case the court addressed itself to the question of damages when loss of use and other subjective factors incapable of mathematical calculation were involved. The court made the following statement at page 321:
"There is no proof in the record of any kind showing how much appellant would be entitled to for the use of the switch tracks, and we doubt if anyone could say with any precision or certainty what amount should be allowed. This is one of those cases which infrequently arises in which it is impossible for one to prove his damage or for the court to assess the amount with exactness. But the bare fact that appellant cannot establish with certainty the amount of damages suffered by it occasioned by plaintiff's having used the facilities will not suffice to discharge the plaintiff from liability when it is clear that under the law appellant is entitled to some compensation. Under these circumstances, the court should fix the quantum of such damages as best it can with the record before it, and such assessment should be `as in cases of offenses, quasi offenses, and quasi contracts' wherein `much discretion must be left to the judge or jury.'"
The instant case is not one where all areas of damage are subjective and impossible to prove with certainty. Here, the trial judge admitted over objection of plaintiff's attorney the testimony of Charles E. Cunningham regarding damages, and relied upon that testimony, without requiring defendant to introduce or produce the contract *589 for the construction of the two tugs containing the demurrage clause or any bills involving the cost of adapting an alternative crane for use on the tugboat contract. Cunningham's pertinent testimony is quoted as follows:
"By Mr. Crow:
Q Would you explain what went into converting this one crane that you had so it could be used for the construction of these two vessels?
A Well, it was a steam crane which you can't use. I mean, we bought a diesel engine, torque converter.
Q Do you recall what the cost of buying the diesel engine was?
A Yes. I could say close, within a couple of hundred dollars. $8,000. The sprockets and chains, shafts and bearings, probably another three.
Q What other costs?
A The track, I bought the track from United Scrap. I didn't buy it from them, I traded them some. I raised a barge for him in exchange for the track. I haven't raised the barge. I'm going to this week, next week, which is probably going to cost $5,000, $6,000. The ties we had to buy. I don't know how many we bought. Cross-ties, I think $10 apiece, and the number I don't know. We have a record of it; 200, something like that.
Q Have you ever been able to use either of these cranes in any construction at Southern Shipbuilding?
A We haven't tried sincewe haven't used them. We're not going to take the money and set something up to use it and then we lose them and they get them back.
Q What would it cost to set those two cranes up so they could be utilized?
A Eight, ten thousand dollars.
Q What was Southern intending to use the winches for?
A Same thing. We were going to put them on a barge, put the winches on the barge with it, to move it, moor it in a certain position along the bank to handle steel for these boats.
Q Has Southern ever utilized these two winches for that purpose?
A No, sir.
Q Why not?
A Same reason.
Q Which is what?
A Too expensive to set them up and not own them.
Q What would it cost to set those two winches up so they would be operable?
A Probably a couple of thousand dollars."
The foregoing testimony by defendant's executive vice president shows two areas of grave doubt. First, if the cranes and winches had not been sequestered, defendant would have expended the sum of $10,000 to place the cranes in operating order and $2,000 to make each of the two sequestered winches operable. Even accepting Cunningham's testimony without supporting documents, the maximum cost to convert the steam railroad crane into a diesel powered crane was. $19,000, only $5,000 more than the cost of converting the sequestered equipment. This difference in cost is in no way definitive, however, since Cunningham could not state the exact cost of a future raising of a sunken barge to which his company agreed in exchange for the railroad tracks upon which the railroad crane was placed. If this $6,000 element of damage is removed, the cost of converting the railroad crane closely approximates the cost of placing the sequestered cranes and winches in operating order for use upon a barge.
This case is much different from the facts in the case relied upon by the trial judge. Here there are few subjective elements involved. Since defendant paid to have the steam railroad crane converted into a diesel crane, it should indeed have evidence of payment of the cost in its posession.[6] *590 However, no receipts, cancelled checks, or other documents were introduced or produced to substantiate Cunningham's admitted "estimate" of damages. Moreover, the existence of a demurrage clause in a contract and the effect thereof are not subjective factors; that contract could easily have been offered in evidence at the trial. Without the benefit of supporting documents, Cunningham's testimony should not have been admitted over plaintiff's objection.
The other area of grave doubt shown by Cunningham's testimony is the question of whether defendant would ever have used the sequestered cranes and winches on the tugboat contract. By Cunningham's own admission, the cranes had not been converted for use in defendant's shipyard after release of the writ of sequestration, and the only reason given for such non-use was the futility of investing additional money to rehabilitate the sequestered equipment when title to it was still in dispute. An important distinction is involved here. We have affirmed the trial court's holding that the sequestration was improvidently issued. However, there can be no doubt the plaintiff had a legal right to place at issue the title to the equipment by filing a suit. The evidence offered by plaintiff was strong, and the trial court was obliged to make a difficult decision in determining the intention of the parties. Cunningham's testimony clearly shows the mere placing at issue of title to the cranes in the plaintiff's law suit was critical in defendant's determination not to use the cranes for any purpose until the suit had been finally resolved. Under these circumstances we can only conclude the cranes probably would not have been used by the defendant even in the absence of their sequestration; and the damages under discussion are solely for wrongful sequestration.
A conceivable area of subjective damage in the present case revolves around the possibility that defendant would not meet the delivery deadline on its alleged tugboat construction contract and thereby incur damages under the $200 per day demurrage clause. Cunningham's testimony established one tug's hull and housing had been completed at the time of trial and the vessel was in the water. The other was in an undescribed state of completion. It is most difficult to presume in advance of the alleged deadline for delivery that the demurrage clause would be invoked. This would be true even if that contract and its demurrage clause had been proved and, as has been pointed out, the record contains no such proof.
In view of all of these circumstances, only a nominal award for damages should be made. We feel the sum of $2,000 would be adequate.
Under Article 3506 of the Code of Civil Procedure the court may allow damages for the unlawful issuance of a writ of sequestration, together with attorney's fees, for the services rendered in connection with the dissolution of the writ. Attorney's fees in this situation are regarded as an element of damages whether the writ is dissolved on contradictory motion or after trial on the merits. In the present case, the writ was dissolved upon defendant's motion prior to trial. The only issue at the trial was a determination of the amount of damages and the amount of attorney's fees sustained as a result of the sequestration.
No evidence was offered regarding the value of the services rendered by defendant's counsel. This court has authority to make an award of attorney's fees in this situation by applying its knowledge of the extent of the services rendered and the value thereof to the record before it.[7] Since Article 3506 allows attorney's fees *591 only "for the services rendered in connection with the dissolution of the writ", and since the writ was dissolved on motion before trial on the merits, we are of the opinion that an award of $1,000 would adequately compensate defense counsel for drafting the answer, the rule to dissolve the sequestration (which substantially tracked the language of the answer previously filed by him), and the time expended by him in the trial of the rule. All proceedings subsequent to the dissolution of the writ involved primarily the issue of the ownership of the sequestered equipment and the issue of defendant's wrongful conversion of the equipment, and attorney's fees are not allowed for services in this connection.
For the reasons assigned, the judgment appealed from is amended by reducing the amount of damages awarded defendant from $15,000 to $3,000. As thus amended, and in all other respects, the judgment is affirmed. Costs of this appeal are to be paid by the defendant-appellee.
AMENDED AND AFFIRMED.
NOTES
[1] La.App., 298 So.2d 115.
[2] Kuhn v. Stan A. Plauche Real Estate Company, 249 La. 85, 185 So.2d 210; Edwards v. Terminix 57, Inc., La.App., 292 So.2d 851.
[3] Civil Code Article 2276; Gulf States Finance Corp. v. Airline Auto Sales Inc., 248 La. 591, 181 So.2d 36; Snow-White Roofs, Inc. v. Boucher, La.App., 182 So.2d 846; Marcann Outdoor, Inc. v. Hargrove, La.App., 140 So.2d 815; see also Atlas Lubricant Corp. v. Federal Ins. Co. of N. J., La.App., 293 So.2d 550.
[4] See Canter v. Koehring Company, La.App., 283 So.2d 716.
[5] La.App., 157 So.2d 317.
[6] This is true except for the cost of the track, which Cunningham testified was exchanged for the future raising of a sunken barge.
[7] Gallagher v. Gallagher, La.App., 190 So.2d 916; see also Redding v. Cade, La.App., 158 So.2d 880; American Legion v. Southwest Title & Ins. Co., La.App., 207 So.2d 393, annulled on other grounds, American Leg. Ed Brauner Post v. Southwest T. & I. Co., 253 La. 608, 218 So.2d 612.